cH

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PAULA TUMAS,                                          )
                                                     )
        Plaintiff,                                   )
                                                     )
    v.                                               )    Case No. 06 C 1943
                                                     )
BOARD OF EDUCATION OF LYONS                          )    Judge John W. Darrah
TOWNSHIP HIGH SCHOOL DISTRICT                        )
NO. 204, and THERESE DeCLERK,                        )
ATTILA WENINGER, DAVID FRANSON                       )
and DENNIS KELLY, individually and in                )
their official capacity,                             )
                                                     )
        Defendants.                                  )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Paula Tumas, filed suit against Defendants, alleging age and sex discrimination and

retaliation in violation of Title VII, the Age Discrimination Employment Act, and Section 1983.

Presently pending before the Court is Defendants' Motion for Summary Judgment.

### FACTS

*General Background*

Tumas, a female over the age of forty, is a retired Assistant Principal who was employed by

the Board of Education of Lyons Township High School District 204 ("School District"). (Def.s'

56.1(a)(3) Statement ¶ 1). The School District is a public high school district, operating two

campuses – the North Campus and South Campus. (Id., ¶ 2). Therese DeClerk is a female

administrator who was promoted from Assistant Principal at the North Campus to Associate

Principal at the South Campus in the summer of 2005. DeClerk is forty-five years old and has been

an educator for seventeen years. (Id., ¶ 3). Dave Franson, a forty-eight-year-old male, was the

Principal of both the North and South Campuses from the 2004 - 2005 school year to the present. Franson has been an educator for twenty-three years and was DeClerk's immediate supervisor. (Id., ¶ 4). Doctor Attila Weninger, an over fifty-year-old male, is the Director of Human Resources. Dr. Weninger has been an educator for twenty-three years. (Id., ¶ 5). Doctor Dennis Kelly, an over-fifty-year-old male, is the Superintendent of the School District. Dr. Kelly has been an educator for thirty-five years. (Id., ¶ 6).

Tumas was employed by the School District for approximately ten years. (Def.'s 56.1(a)(3) Statement ¶ 9). Tumas and DeClerk met during the 1998-1999 school year and worked together as Assistant Principals on the same campus since the 1999 - 2000 school year. DeClerk did not think their relationship was very collegial at that time, and they did not work well together. (Id., ¶ 10). In the summer of 2005, DeClerk became the Associate Principal at the South Campus and Tumas's immediate supervisor. (Id., ¶ 9). At that time, Tumas and Edward Piotrowski, a twenty-nine-year-old male, were the Assistant Principals at the South Campus. As Assistant Principals, Tumas's and Piotrowski's main duties were student discipline and attendance. In addition, they evaluated teachers and were responsible for monitoring the arrival and departure of students on the school buses. (Id., at ¶ 11). This was Piotrowski's first year as an Assistant Principal. The Assistant Principals at the North Campus in the 2005-2006 school year were Jeff Dietrich (a male) and Kristine Costopoulos (a female). (Id., ¶ 12).

### Tumas's Employment

During the time that Tumas was Assistant Principal, she understood that she was required to report to work from 7:30 a.m. to 3:30 p.m., except on the two days of the week she was assigned to stay until 4:30 p.m. for bus duty. Piotrowski was also scheduled to work until 4:30 two days a

week for bus duty. (Def.'s 56.1(a)(3) Statement ¶¶ 13-14). When Franson became Principal, he was informed that every Assistant Principal was supposed to work until 4:30 p.m. two days a week and that the two Associate Principals were each supposed to work until 4:30 p.m. one day per week. An administrator was always assigned until 4:30 p.m. in case a student discipline or bus issue arose while the students were being transported home. (Id., ¶ 16).

On August 23, 2005, Franson and DeClerk had a meeting with Tumas to raise their concern that Tumas left student registration an hour early the prior day without notice. (Def.'s 56.1(a)(3) Statement ¶ 17). At this meeting, Tumas was told to report absences to her immediate supervisor, DeClerk, and if DeClerk was not available, to leave a message with Franson. (Id., ¶ 18). Tumas was also told to eat her lunch in her office with the blinds closed[1] and the door closed and to leave her school-issued telephone on twenty-four hours a day, seven days a week. (Id., ¶ 19).

When Tumas was not feeling well, she was allowed to leave work early and was directed by Dr. Weninger and DeClerk to use sick or personal time if she left early. (Def.'s 56.1(a)(3) Statement ¶ 36). As a matter of School District practice, school administrators who are absent for illness or personal reasons should report this absence to their direct supervisor and must also submit a Request for Approved Absence form so the absence can be deducted from the employee's sick-time allotment. School administrators are not required to call the substitute coordinator to report an absence. (Id., ¶ 37). School administrators were also required to complete an absence form if they went home sick an hour or fifty minutes before the end of the day, including if they left before their assigned late/bus duty. (Id., ¶ 41). DeClerk directed both Piotrowski and Tumas to call her whenever they were absent. (Id., ¶ 39).

_____

[1]Defendants concede this fact only for purposes of summary judgment.

3

Piotrowski called both DeClerk and Franson when he was absent. (Def.'s 56.1(a)(3) Statement ¶ 40). Piotrowski took sick and personal time off during the 2005 - 2006 school year because his mother was very ill and his wife had a baby (with complications). Piotrowski reported his time off every time he left work early or was absent. (Id., ¶ 42). Tumas claims that she was the only employee asked to provide a doctor's note when she was ill for more than three consecutive days once during the 2005 - 2006 school year. Tumas does not know whether Piotrowski was ever absent three days in a row during the 2005 - 2006 school year. (Id., ¶ 43). According to Franson, it was standard procedure to request a doctor's note from an employee whenever that employee was absent for three or more consecutive days. (Id., ¶ 44).

Between August 23, 2005 and October 26, 2005, Franson had several concerns regarding Tumas's job performance. These concerns included: (1) Tumas seemed unwilling to work in concert with the alternative school, (2) Tumas failed to quickly investigate a student discipline matter, and (3) a school social worker and/or counselor expressed that Tumas was not working with them as a team player. Franson also had issues with Tumas's attendance and, therefore, kept contemporaneous notes regarding her absences. (Def.'s 56.1(a)(3) Statement ¶ 20). Between August 21, 2005 and November 9, 2005, DeClerk testified she had the following concerns with Tumas's performance: (1) Tumas failed to quickly investigate or follow-up on various student discipline matters; (2) Tumas exhibited unprofessional, uncooperative, and near-"harassing" behavior towards DeClerk and the school social worker; and (3) Tumas left meetings abruptly and with no explanation. DeClerk kept detailed contemporaneous notes regarding these concerns. (Id., ¶ 21).

4

From August 25, 2005 through November 4, 2005, Tumas reported twelve absences. From August 25, 2005 through November 2, 2005, Tumas left messages indicating that she was leaving work early (not staying for bus duty) six times. (Def.'s 56.1(a)(3) Statement ¶ 22). Dr. Weninger routinely directed school supervisors to document employee absences if they were concerned about an employee's attendance. (Id., ¶ 23).

On November 3, 2005, Dr. Weninger contacted Tumas and requested a meeting to discuss his concern that she had taken sick leave without submitting a required Request for Approved Absence from either before or after the absences. On November 7, 2005, Dr. Weninger provided Tumas with a list of seven days during which she had taken sick leave without completing the Request for Approved Absence form. (Def.'s 56.1(a)(3) Statement ¶ 24). On November 9, 2005, DeClerk and Franson had a meeting with Tumas to discuss their continuing concerns with Tumas's job performance, including her failure to properly report absences. Tumas testified she was told during the meeting to call only DeClerk to report absences. (Id., ¶ 25).

On February 16, 2006, Dr. Weninger and DeClerk met with Tumas to discuss her suspension of four students who were involved in the same fight. Dr. Weninger and DeClerk felt Tumas had not adequately investigated the incident and the individual students' backgrounds. Because several of the students were already "on behavior or gang contracts," DeClerk believed they should have received harsher discipline. (Def.'s 56.1(a)(3) Statement ¶ 27). DeClerk verbally reprimanded Piotrowski for his decision regarding discipline of a fifth student involved in the same fight in February 2006. Piotrowski did not receive a written reprimand because he was a "rookie." (Id., ¶ 28). Tumas received a written reprimand for the incident. (Plaint.'s 56.1(b)(3) Statement ¶ 4).

5

On September 21, 2005, Tumas filed an Equal Employment Opportunity Commission ("EEOC") Charge of Discrimination against the School District. Neither Dr. Kelly, Franson, nor DeClerk had any recollection regarding if, or when, they became aware that Tumas filed the EEOC charge. (Def.'s 56.1(a)(3) Statement ¶ 30).

During the time that Tumas was employed by the School District, she had a twenty-five-minute lunch period. (Def.'s 56.1(a)(3) Statement ¶ 45). During the 2005-2006 school year, all the administrators had a twenty-five-minute lunch period. (Id., ¶ 47). Tumas generally ate lunch in her office because she brought her lunch from home. (Id., ¶ 46). Other Assistant Principals were allowed to leave their campuses for lunch. (Id., ¶ 48). Tumas recalled that Piotrowski went off school property during lunch to pick up McDonald's five or six times and left school grounds twice to smoke a cigarette. (Id., ¶ 49). Piotrowski usually ate lunch in his office and could not recall any time when he ate lunch off-campus with other administrators. Generally, he worked during his lunch and ate when he had a chance. (Id., ¶ 50). DeClerk left the school building one time for lunch during the 2005-2006 school year. (Id., ¶ 51).

On September 28, 2005, Tumas filed suit in Cook County, Illinois, alleging that her lunch break was five minutes too short. The School District was served with the complaint on October 17, 2005. (Def.'s 56.1 (a)(3) Statement ¶ 31). In her state complaint, Tumas sought damages for alleged physical and psychological symptoms as a result of alleged lunch restrictions placed upon her. She also sought an order enjoining and restraining the School District from enforcing the twenty-five-minute lunch period and from restricting her from going outside the school building during her lunch period. Tumas sought personal damages in the lawsuit because she

6

"wanted to make sure that [she] had everything that everyone was supposed to have." (Id., ¶ 32). On March 29, 2007, a bench trial was held on Tumas's state complaint. The verdict was in favor of the School District and was not appealed. (Id., ¶ 33).

Tumas was not permitted to attend professional conferences during the 2005-2006 school year. (Def.'s 56.1(a)(3) Statement ¶ 52). Dr. Weninger denied Tumas's requests for professional leave during the 2005-2006 school year because: (1) Tumas's initial requests were immediately following periods of time when she had already missed several days of work (for sick or personal reasons), causing Dr. Weninger to conclude it was in the School District's best interest to have Tumas remain on campus at that time; (2) one request was denied because the request was to attend a conference scheduled for the day before winter break when student misconduct historically increases and all administrators are needed on campus; and (3) Tumas's requests during the second semester were denied because it is the School District's practice to prohibit employees from attending professional conferences the semester immediately before they retire. (Id., ¶ 53). Tumas admits she was absent fifteen to twenty days during the 2005-2006 school year and that she was prohibited from attending professional conferences because of absenteeism both before and after she had filed her EEOC charge. (Id., ¶ 56).

All school administrators are issued a telephone. Franson tries to keep his telephone turned on twenty-four hours a day, seven days a week. Piotrowski keeps his telephone on at all times. (Def.'s 56.1(a)(3) Statement ¶ 57). Tumas was never called on her school-issued telephone in the middle of the night, in the evening, or on any weekend. Tumas could recall only one time when she

was paged at school over the intercom at 4:30 p.m. because her telephone was not working. (Id., ¶ 58). Piotrowski was called on his school-issued telephone during lunch time and while attending two sporting events to assist with student discipline, even though he was not the administrator assigned to the task. (Id., ¶ 59).

Two of three expulsion recommendations made by Tumas during the 2005-2006 school year did not result in student expulsions. (Def.'s 56.1(a)(3) Statement ¶ 60). As to the first expulsion recommendation, Tumas and Franson both recommended expulsion; but the Superintendent declined to pursue it on the advice of legal counsel. (Id., ¶ 61). As to the second expulsion recommendation, Franson decided to suspend the student instead of expulsion because the conduct involved a fluorescent yellow toy gun and the student (an orphan) would have been removed from his residence and sent to an orphanage in Joliet if the School District pursued the expulsion. (Id., ¶ 62).

Almost daily, during the 2005-2006 school year, DeClerk would check on Tumas's whereabouts during school hours by visiting the Assistant Principals' office and asking the office secretaries about Tumas. (Def.'s 56.1(a)(3) Statement ¶ 63). In October 2005, DeClerk asked a secretary to have Tumas stop by her office and then later told Tumas she did not need to see her. That same month, Dr. Weninger visited two different rooms to find where Tumas was evaluating a teacher. (Id., ¶ 64). Piotrowski was never asked to watch Tumas. (Id., ¶ 65). Secretaries in the Assistant Principals' office testified that DeClerk stopped by the office looking for both Tumas and Piotrowski. (Id., ¶ 66).

Tumas felt "humiliated" during the following events: (1) In an October 2005 conversation in Tumas's office, with the door open, DeClerk asked if Tumas had interviewed a student yet; and when Tumas stated she had not, DeClerk raised her voice and stated that she wanted it done that day.

8

(2) In September 2005, DeClerk repeatedly told Tumas she needed to talk to several football coaches about a student disturbance. (3) In October 2005, DeClerk raised her voice in front of secretaries about a student at the alternative school and also about Tumas's leaving the building. (4) In November 2005, Franson asked Tumas "sternly and in a different tone" to step into his office and then explained that Tumas was responsible for disciplining sophomore students assigned to the alternative school. (5) In October 2005, Franson raised his voice in front of secretaries to ask Tumas about a student issue. And (6) on parent-teacher conference day, Dr. Weninger had Tumas paged to DeClerk's office; and when Tumas arrived, Dr. Weninger asked Tumas to meet with him and DeClerk. Tumas wanted to tape record the meeting, but Dr. Weninger told her she could not do so. (Def.'s 56.1(a)(3) Statement ¶ 67).

Piotrowski, whose office is next to Tumas's office, never observed Franson or DeClerk humiliate Tumas or act in a rude, unprofessional, impolite or inappropriate manner. (Id., ¶ 68). Tumas also felt humiliated because she was excluded from a meeting with DeClerk, Franson and Piotrowski to discuss concerns that a student's mother might come on campus with a gun. Piotrowski explained that he was already talking to the student's father on the telephone with DeClerk and the School Resource Officer about family issues. During the telephone conference, the father mentioned the mother said she was going to buy a gun. At approximately the same time, the mother called to say that she was coming on campus to pick up the student. Piotrowski asked the father to come to the campus immediately to pick up the student and then moved to the front entrance; at which time, he informed Tumas and security about the situation. (Id., ¶ 71).

Tumas felt "excluded" when: (1) DeClerk did not invite her to a meeting between DeClerk and a parent regarding the sexual abuse of a student, although, several days later, DeClerk explained the situation and showed a picture of the alleged perpetrator to Tumas and a school counselor; (2) DeClerk and Franson had meetings with parents to which she was not invited; (3) on one occasion, a sophomore student was called to the office by DeClerk, without informing Tumas; (4) on parent-teacher conference day, DeClerk and Piotrowski were in Franson's office; and "there was a lot of levity and laughter coming out of the room"; and (5) once during the Spring of 2006, DeClerk and Franson were aware of a picture of a sophomore student with a gun but did not inform Tumas until five days later. (Def.'s 56.1(a)(3) Statement ¶ 69). Piotrowski was not regularly invited to participate in meetings between DeClerk and teachers or students. He would also not initially be invited to meetings between DeClerk and parents regarding student discipline but might be called into the meeting afterwards. (Id., ¶ 70). DeClerk also criticized Tumas when Tumas refused to inform security to check all rooms before exiting the building during a fire drill, after DeClerk became aware that a teacher refused to let students leave during a previous fire drill and several parents complained. (Id., ¶ 73).

### Tumas's Retirement

In May 2005, Tumas sent an e-mail to Dr. Weninger, stating her intent to retire in June 2006. Tumas also sent a letter, stating that she intended to retire under the Teacher Retirement System ("TRS") Early Retirement Option ("ERO"). (Def.'s 56.1(a)(3) Statement ¶ 74). As a result, the School District completed and sent a Pipeline ERO Certificate to TRS that identified Tumas as an employee eligible under the pipeline ERO. (Id., ¶ 75). Tumas was told by TRS to review and sign a Retirement Application that was prepared by TRS based on conversations she had with TRS

10

agents. This application indicated that Tumas was not electing ERO. Tumas reviewed the application carefully enough to change her address on the application. However, Tumas signed the application, even though she had wanted to elect ERO. (Id., ¶ 76). If Tumas had elected ERO, she would have been required to pay a penalty of approximately $23,000; and the School District would have been required to pay a penalty of approximately $116,000. (Id., ¶ 77).

David Sellers, Director of Business Services for the School District, testified that the School District is a "third-party bystander" with respect to Tumas's ERO choice. The School District is required to pay the ERO penalty if Tumas makes the election but is not a participant in how that decision is made or administered. TRS is the agency with the power to grant or deny Tumas's request to change her ERO election. (Def.'s 56.1(a)(3) Statement ¶ 78). In October 2006, Tumas (through her attorney) asked the School District to contact TRS in an effort to change her ERO election. On November 20, 2006, the School District considered but declined Tumas's request. (Id., ¶ 79).

## ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986) (*Celotex*). All of the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*). However, a party cannot defeat summary judgment by relying

11

on unsubstantiated facts or by merely resting on its pleadings. *See Hemsworth, II v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007) (*Hemsworth*); *Greer v. Board of Educ. of the City of Chicago*, 267 F.3d 723, 729 (7th Cir. 2001). Instead, the party that bears the burden of proof on an issue must affirmatively demonstrate, by specific factual allegations, that a genuine issue of material fact exists that requires a trial. *See Hemsworth*, 476 F.3d at 490.

### Age and Sex Discrimination Claims

A plaintiff may prevail on her discrimination claim either through the "direct method" – showing intentional discrimination – or through the similar burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (*McDonnell Douglas*). *See Blise v. Antaramian*, 409 F.3d 861, 866 (7th Cir. 2005) (*Blise*). The direct method of proving discrimination requires the introduction of direct or circumstantial evidence of discrimination. *See Blise*, 409 F.3d at 866. Tumas concedes in her response brief, that she has no direct evidence of discrimination and is proceeding under the *McDonnell Douglas* burden-shifting framework.

To establish a *prima facie* case of race discrimination under the *McDonnell Douglas* framework, Tumas is required to demonstrate that: (1) she was a member of a protected class; (2) she was meeting her employer's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees not in the protected class were treated more favorably. *See Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc.*, 254 F.3d 644, 650 (7th Cir. 2001). If Tumas demonstrates a *prima facie* case, the burden shifts to the Defendants to

demonstrate "a legitimate, nondiscriminatory reason for the action." *Blise*, 409 F.3d at 867. If Defendants meet this burden, the burden shifts back to Tumas to demonstrate the proffered reason is pretextual. *Blise*, 409 F.3d at 867.

Tumas is a member of a protected class. The issue of Tumas's meeting her employer's performance expectations is discussed below.

Tumas argues that the totality of the "humiliating" and actions taken against her constitute an adverse action. However, an adverse action must be materially adverse, one that significantly alters the terms and conditions of the employee's job. *See Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (*Griffin*). Actions such as harder work assignments, additional job responsibilities, unfair reprimands, trivial matters, and oral and written reprimands do not constitute an adverse action. *See Griffin*, 356 F.3d at 829 (collecting cases). Here, the actions taken against Tumas during the 2005-2006 school year – keeping notes on Tumas's conduct and absenteeism, having her eat lunch in her office, reprimanding her, having her keep her school-issued telephone on, using a stern voice, and not including her in all meetings – do not constitute an adverse action. *See Griffin*, 356 F.3d at 829; *Williams v. Illinois Dept. of Corrections*, No. 05 C 2151, 2006 WL 2495020 (N.D. Ill.

Aug. 25, 2006) (being singled out for enforcement of policy on submitting weekly activity reports, being unfairly reprimanded, denied schedule change, subjected to an audit, given a negative performance evaluation, and denied rapid approval of her vacation request do not constitute adverse job action).

Lastly, as to the *prima facie* case, Tumas has failed to identify similarly situated employees that were not in the protected class that were treated more favorably. A plaintiff demonstrates that another employee is "similarly situated" to her by "show[ing] that there is someone who is directly

13

comparable to [her] in all material aspects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). A court must look at all relevant factors, the number of which depends on the specific case, when making this determination. *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000) (*Radue*). In disciplinary cases in which the plaintiff alleges that she was disciplined more harshly than a similarly situated employee, the plaintiff must show that she is similarly situated with respect to performance, qualifications, and conduct. *See Radue*, 219 F.3d at 617. "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue*, 219 F.3d at 617-18.

Tumas argues that Piotrowski was treated more favorably than she was for several reasons. First, DeClerk did not keep a detailed log on Piotrowski as she kept on Tumas. However, DeClerk kept the detailed log on Tumas because of issues related to Tumas's performance and absenteeism that did not similarly exist with Piotrowski. Tumas received a written reprimand after the fight involving multiple students, and Piotrowski only received a verbal warning. However, DeClerk testified that Piotrowski received "lighter" disciplinary action because it was his first year as Assistant Principal as compared to Tumas's ten years of experience. Tumas had to report absences directly to DeClerk. However, Piotrowski also reported his absences to DeClerk; and DeClerk did not have the same concerns as to Piotrowski's absences that she did with Tumas's absences. Piotrowski was not ordered to eat lunch in his office. Lastly, while Defendants contest this "fact," it is not material because it is undisputed that Piotrowski ate his lunch in his office nearly every day.

Tumas also argues that other administrators were allowed to attend seminars the day before a holiday. However, she concedes that no other Assistant Principal was allowed to attend a seminar the day prior to a holiday. Based on the above, Tumas has failed to demonstrate that Piotrowski or another similarly situated employee was treated more favorably than her; and she has failed to establish a *prima facie* case of discrimination.

Assuming argumendo, that Tumas had presented a *prima facie* case, she has failed to demonstrate that Defendants' proffered reasons for the actions taken "against" her were a pretext to discrimination.

To demonstrate pretext, a plaintiff must show that the employer's explanation is unworthy of credence or that a discriminatory reason more likely motivated the employer. *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 395 (7th Cir. 1998) *(Debs)*. Pretext in this context does not mean a mistake; rather, it means "a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir 1995).

As discussed above, discipline actions taken against Tumas were based on DeClerk's and Dr. Weninger's concerns over some of Tumas's actions and absences. Requirements associated with her position (school-issued telephone, reporting absences) were equally shared by other administrators; and the denial of her attendance at seminars was based on the timing of the seminar in relation to her recent absences or holidays and the School District's policy not to allow soon-to-be retired administrators from attending seminars. Thus, not only has Tumas failed to show she met the School District's legitimate performance expectations but she has also failed to demonstrate that Defendants' reason for their actions were a pretext to discrimination.

15

Based on the above, summary judgment is granted in Defendants' favor on Tumas's sex and age discrimination claims.

## *Title VII Retaliation Claim*

Title VII also prohibits an employer from retaliating against an employee that has complained of unlawful practices. *See* 42 U.S.C. § 2000e-3(a). An employee may present either direct or indirect evidence of retaliation. *See Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404 (7th Cir. 2007) (*Humphries*). Under the direct method, a plaintiff must show: (1) she engaged in a statutorily protected activity, (2) she was subjected to an adverse employment action, and (3) there is a causal connection between the two events. *See Humphries*, 474 F.3d at 404.

Tumas has established that she engaged in a statutorily protected activity. As to her retaliation claim, Tumas argues (in addition to those already addressed above) that the School District's refusal to assist her in correcting her ERO option is an adverse action as it caused her to have a decrease in benefits. However, the error in the ERO option was made by Tumas. The School District did all that was required of it as to Tumas's retirement. Any changes or corrections of errors in the retirement application must be made by the Board of Trustees for TRS, per the Illinois Pension Code. *See* 40 ILCS 5/16-192. If Tumas is not satisfied with the TRS Board's response, she may then have that response reviewed under the Illinois Administrative Review Act. *See* 40 ILCS 5/16/200.

In support of her argument that there is a causal connection between her filing the EEOC charge and the adverse actions, Tumas relies upon the timing of the disciplinary actions (assuming the disciplinary actions constituted an adverse action) taken against her and her filing of the EEOC charge and state-law complaint. Other than the timing of the events, Tumas provides no evidence

16

of a retaliatory motive. "Speculation based on suspicious timing alone . . . does not support a reasonable inference of retaliation." *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000). A plaintiff does not meet her burden under the direct method of proof of retaliation by presenting no evidence of retaliatory motive other than the timing of her termination. *See Burks v. Wisconsin Dept. of Transp.*, 464 F.3d 744, 758-59 (7th Cir. 2006) (*Burks*). Furthermore, the undisputed facts demonstrate that disciplinary actions were taken against Tumas based on the same concerns (performance and absenteeism) prior to her filing the EEOC charge and the state-law complaint. In addition, any speculation based on timing alone fails to support a reasonable inference of retaliation based on the ERO option because several months had passed between the filing of the EEOC charge and the state-law complaint; and the School District did all that was required of it as to Tumas's retirement.

Under the indirect method, a *prima facie* case of retaliation requires the plaintiff to demonstrate that: (1) she engaged in a statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite meeting her employer's legitimate job expectations, she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. If the plaintiff establishes a *prima facie* case, the employer must offer a legitimate, noninvidious reason for the adverse employment action. Once the employer does this, the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason for termination is a pretext to retaliation. *See Tomanovich v. City of Indianapolis*, 457 F.3d 657, 663 (7th Cir. 2006).

For the same reasons as discussed above as to Tumas's sex and age discrimination claims, Tumas's retaliation claim under the burden-shifting method also fails. Summary judgment is granted in Defendants' favor on Tumas's Title VII retaliation claim.

## Section 1983 Retaliation Claim

Lastly, Tumas alleges that the Defendants retaliated against her for filing the state-law complaint pertaining to her twenty-five-minute lunch period in violation of First Amendment Right of free speech.

When evaluating a Section 1983 claim for retaliation in violation of First Amendment rights, the plaintiff must establish that the employee's speech was constitutionally protected and that the speech was a substantial or motivating factor in the retaliatory action. *See Spiegla v. Hull*, 481 F.3d 961, 965 (7th Cir. 2007) (*Spiegla*).

Under certain circumstances, the First Amendment protects a public employee's right to speak as a citizen about matters of public concern. *See Garcetti v. Ceballos*, ___ U.S. ___, ___, 126 S. Ct. 1951, 1957 (2006) (*Garcetti*); *Connick v. Myers*, 461 U.S. 138, 147-48 (1983) (*Connick*); *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968) (*Pickering*). An employer may not retaliate against an employee for engaging in protected speech. *See Sigsworth v. City of Aurora*, 487 F.3d 506, 509 (7th Cir. 2007) (*Sigsworth*). A two-part balancing test, the *Connick-Pickering* test, is applied to determine if speech is constitutionally protected. Under this test, a public employee establishes that his speech was constitutionally protected if (1) the employee spoke as a citizen on matters of public concern and (2) the employee's interest as a citizen in commenting upon matters of public concern outweighs the State's interest, as an employer, in promoting the efficiency of the public service it performs through its employees. *See Sigsworth*, 487 F.3d at 509. As to the issue

18

of whether a public employee was speaking as a citizen for First Amendment purposes, "before analyzing whether an employee's speech is of public concern, a court must determine whether the employee was speaking 'as a citizen' or, by contrast, pursuant to his duties as a public employee." *Sigsworth*, 487 F.3d at 509, *citing Garcetti*, 126 S. Ct. at 1960. If the public employee's speech was made pursuant to his official duties, that speech is not constitutionally protected. *See Spiegla*, 481 F.3d at 965-66.

Here, Tumas's lawsuit as to her twenty-five-minute lunch period was not made pursuant to her official responsibilities.

Next, the Court must determine whether Tumas was speaking on a matter of public concern. Whether speech addresses a matter of public concern depends upon "the content, form, and context of [the speech], as revealed by the whole record." *Connick*, 461 U.S. at 147-48. Of these factors, the content of the speech is the most important. *See Wernsing v. Thompson*, 423 F.3d 732, 751 (7th Cir. 2005). Determining the motivation of the speaker is also important in making the determination of whether the speech is constitutionally protected because speech that is intended to further a private interest or to air a personal employee grievance is not constitutionally protected, even if the speech addresses issues of public interest. *See Metzger v. DaRosa*, 367 F.3d 699, 702 (7th Cir. 2004); *Kokkinis v. Ivkovich*, 185 F.3d 840, 844 (7th Cir. 1999); *Nagle v. Village of Calumet Park*, No. 05 C 7039, 2006 WL 3797726 (N.D. Ill Dec. 18, 2006) (*Nagle*). "If the speech concerns a subject of public interest but the *expression* addresses only the personal effect upon the employee, then as a matter of law the speech is not of public concern." *Marshall v. Porter County Plan Comm'n*, 32 F.3d 1215, 1219 (7th Cir. 1994).

Tumas's speech – the state-court complaint about her twenty-five-minute lunch period – was not a matter of public concern. *See Snider v. Belvidere Township*, 216 F.3d 616, 619 (7th Cir. 2000) (employee's speech regarding salary disparity was not a matter of public concern). Furthermore, Tumas's motivation was to further her own interest and air her personal grievance, as demonstrated by the damages that she sought and the reason she sought such damages.

Even if Tumas's speech was protected, she has failed to demonstrate that her speech (the state complaint) was a substantial or motivating factor in the alleged retaliatory action(s). Chronology and/or proximity between the speech and the alleged retaliatory action are insufficient to demonstrate that the speech was a substantial or motivating factor in the alleged retaliatory action. *See Squibb v. Memorial Ctr.*, 497 F.3d 775, 787 (7th Cir. 2007); *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000).

Here, disciplinary actions taken against Tumas were based on DeClerk's and Dr. Weninger's concerns over some of Tumas's actions and absences that took place both before and after Tumas filed the state-court complaint. Requirements associated with her position (school-issued telephone, reporting absences) were equally shared by other administrators; and the denial of her attendance at seminars was based on the timing of the seminar in relation to her recent absences or holidays and the School District's policy not to allow soon-to-be retired administrators from attending seminars. As to the School District's refusal to assist Tumas in correcting the error on her ERO option, that action took place approximately fourteen months after the state-court complaint had been filed. In addition, the School District was not required to assist Tumas; and there is no evidence that the

School District had helped any other employee correct such an error. Accordingly, Tumas has failed to demonstrate that the speech was a substantial or motivating factor in the alleged retaliatory action(s).

Based on the above, summary judgment is granted in Defendants' favor on Plaintiff's Section 1983 First Amendment claim.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted.

Dated: November 17, 2007

JOHN W. DARRAH
United States District Court Judge